GLENN AGRE BERGMAN & FUENTES LLP
DAVID R. CALLAWAY (SBN 121782)
BURKE E. STRUNSKY (SBN 203582)
580 California Street, Suite 1420
San Francisco, CA 94104
Telephone: (415) 599-0880
dcallaway@glennagre.com
bstrunsky@glennagre.com

NIESAR & VESTAL LLP
JESSICA TARAN (SBN 224025)
90 New Montgomery St., 9th Floor
San Francisco, CA 94105
Tel: (415) 882-5300
jtaran@nvlawllp.com

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARISOL AQUINO; SANTA FE BERNACER; RENITA CASTANEDA; RENATO CASTANEDA; HENADENE CATOLICO; MICHAEL CLARK; SANTITO CRUZ DE GUZMAN; RHODORA DELA CRUZ; ELEANOR DELUNA; BASILIA ESTIMO; ELAINE EVERETT; MICHELLE FERMIN; RICARDO FLOIRENDO; ALICIA FORTALEZA; KAREN FRANKLIN; MARIMER GEBUSION; MALU GONZALO; JOSE GRATAIS; MARISSA GUTIERREZ; DONNA HANSEN; MILAGROS JOSUE; LANI LAGUDAS; MARY JEAN LAYUGAN; EVANGELINE LEYSON; SUSAN LIM; PRINCESITA LIWANAG; ENRIQUE LOPEZ; ROMULO MAGTOTO; BELLA MANANSALA; ESTHER MARANIA; | Case No. <br><br> **COMPLAINT FOR:** <br> **(1) SCHEME LIABILITY UNDER SECTION 10(b) OF THE EXCHANGE ACT AND RULES 10b-5(a) AND (c);** <br> **(2) VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5(b);** <br> **(3) CONTROL PERSON LIABILITY UNDER SECTION 20(a) OF THE EXCHANGE ACT;** |

| | |
|---|---|
| YVONNE MARTIN; VERANETTE MC KENZIE; CELEDONIA MEHR; TRINIDAD RUTH MEJIA; ARTHUR MENDOZA; YONNE MIJARES; POEU NAK; DEMETRIA ORDANZA; VIOLETA PADERNA; CORAZON PADILLA; MICHAEL PARE; MILDRED PARCASIO; ENEIDA PAREDES; JULIET PESCOZO; JESSERIE QUITORIANO; MAYNARD RAQUINIO; JULIUS RAYO; FLORENCE REMULLA; FLORENCE REYES; JACQUELINE RIVERA; MARIA RIVERA; WILFREDO RIVERA; ROBERT ROGGE; AURELIA SAMSON; LAGRIMAS SAULOG; ARIANNE SILVA; JUNE SMALL-ROLSTON; ALMA SORIA; CARLITO SORIA; LORETA TUASON; JOSEPHINE TURK; NOEL ULEP; DAISY-ANN VALDEZ; PAUL VALDEZ; CHONA VALLEJO; BRIAN VASALLO, <br><br> *Plaintiffs,* <br><br> v. <br><br> STRATA TRUST COMPANY, a Texas trust company; VIVA WEALTH FUND I, LLC, a Nevada limited liability company; WEALTH SPACE, LLC, a California limited liability company; VIVAKOR, INC., a Nevada corporation; THOMAS YOUNG LEE, an individual; MATTHEW NICOSIA, an individual; CINDY VAN TRUC TRAN, an individual; DANIEL RUPPER, an individual; LAUREN RUPPER, an individual; and DOE DEFENDANTS 1 through 50, inclusive, <br><br> *Defendants.* | **(4) VIOLATION OF CAL. CORP. CODE § 25110;** <br> **(5) VIOLATION OF CAL. CORP. CODE § 25401;** <br> **(6) VIOLATION OF CAL. CORP. CODE § 25504;** <br> **(7) COMMON LAW FRAUD;** <br> **(8) NEGLIGENT MISREPRESENTATION;** <br> **(9) GRAND THEFT (CAL. PENAL CODE § 496);** <br> **(10) AIDING AND ABETTING SECURITIES FRAUD (CAL. CORP. CODE § 25504.1);** <br> **(11) NEGLIGENT HIRING AND RETENTION;** <br> **(12) FINANCIAL ELDER ABUSE (CAL. WELF. & INST. CODE §§ 15600 ET SEQ.); AND** <br> **(13) UNFAIR BUSINESS PRACTICES (CAL. BUS. & PROF. CODE § 17200)** <br><br> **<u>DEMAND FOR JURY TRIAL</u>** |

## NATURE OF ACTION

1.     This action is brought by sixty-six (66) Plaintiffs, who collectively invested more than $6.8 million in securities offered, solicited or facilitated by and through Defendants Strata Trust Company ("Strata Trust"), Thomas Young Lee ("Lee"), Matthew Nicosia ("Nicosia"), Vivakor, Inc. ("Vivakor"), Viva Wealth Fund I ("VWF"), Wealth Space, LLC ("Wealth Space"), Cindy Van Truc Tran ("Tran"), Daniel Rupper ("D. Rupper"), and Lauren Rupper ("L. Rupper") (collectively, "Defendants").

2.     This action asserts claims under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Section 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder, California Corporations Code Sections 25110, 25401, 25500, 25504, and 25504.1, California Business and Professions Code Section 17200, California Penal Code Section 496, California Welfare and Institutions Code Sections 15600 et seq. ("the Elder Abuse Act"), and common law fraud, negligent misrepresentation, and negligent hiring and retention.

3.     Defendants orchestrated a fraudulent securities scheme targeting predominantly lower middle-class investors, many of whom were first- or second-generation immigrants and retirees with limited investment experience. Defendants falsely represented that the offerings complied with federal and state securities laws, that all investors were accredited, and that investor capital was protected. In truth, Defendants knowingly admitted hundreds of non-accredited investors, failed to file required regulatory notices with the SEC and the California Department of Financial Protection and Innovation ("DFPI"), and never provided mandated audited financial statements. By knowingly admitting hundreds of non-accredited investors, Defendants destroyed the very exemption from registration on which the legality of the entire offering depended. Under Rule 506(b) of Regulation D, no more than thirty-five non-accredited investors may participate in an exempt offering, and each

**COMPLAINT**

1  such investor must receive audited financial statements and other disclosures

2  mandated by Rule 502(b). Once Defendants exceeded the thirty-five-investor

3  threshold without providing the required disclosures, the Rule 506(b) exemption was

4  irrevocably lost, and every sale of VWF securities—to accredited and non-accredited

5  investors alike—became an unlawful offer and sale of unregistered securities in

6  violation of Section 5 of the Securities Act of 1933 and Section 25110 of the

7  California Corporations Code. Defendants' admission of non-accredited investors

8  was not a technical deficiency; it rendered the entire offering illegal from inception

9  and stripped every Plaintiff of the protections that federal and state securities

10  registration requirements are designed to provide.

11       4.      Vivakor promoted to Plaintiffs, through a series of in-person and online

12  presentations and accompanying pitch materials (collectively, the "Vivakor RPC

13  Pitch") (true and correct copies of representative slides from the Vivakor RPC Pitch

14  are attached hereto as Exs. A through J), an investment opportunity centered on its

15  soil remediation technology, which utilized modular processing units known as

16  Remediation Processing Centers ("RPCs"). Vivakor represented that it had operated

17  RPCs at multiple locations, including Kuwait and Utah, and used the claimed

18  performance of those units to solicit investment in the construction of additional

19  RPCs. VWF was organized as the financing vehicle for this purpose, and Plaintiffs

20  collectively invested approximately $6.8 million through VWF pursuant to

21  Memoranda of Indebtedness ("MOIs") and Subscription Agreements, the proceeds of

22  which were directed toward the construction of a new RPC unit. Under the terms of a

23  separate RPC Equipment Lease Agreement between VWF and VivaVentures

24  Remediation Corp. ("Viva Remediation"), a wholly owned subsidiary of Vivakor,

25  Viva Remediation would lease and operate the Plaintiffs' RPC and pay VWF 25% of

26  the gross proceeds generated from its operation. The Vivakor RPC Pitch represented

27  that the cost to build each RPC unit was $4.875 million, which included a $1 million

28

intellectual property licensing fee payable to Vivakor, though this figure was later increased to over $6 million per unit.

5.    Defendants, moreover, diverted substantial portions of Plaintiffs' invested capital toward undisclosed commissions of 7% to 10%—far exceeding the 2% they represented—as well as marketing expenses and personal enrichment of Lee, Nicosia, and affiliated insiders. The revenue claims were fabricated, the technology was incapable of producing the results represented, and investor funds were siphoned to cover Vivakor's mounting losses.

6.    Defendant Strata Trust provided the liquidity and institutional credibility this scheme needed to succeed—liquidity that no traditional brokerage or fiduciary would have offered. Strata Trust was the exclusive gateway through which Plaintiffs' retirement savings flowed into VWF to finance Vivakor: the majority of the investment by Plaintiffs could not have occurred without Strata Trust's approval and execution. Far from a passive custodian, Strata Trust embedded its own personnel inside Wealth Space—the operational arm of VWF—to train promoters, accepted account applications pre-filled by promoters rather than investors, offered financial incentives to drive transaction volume, and ceded control of investor accounts to the very entities that were selling the securities to unaccredited investors. Without Strata Trust, the majority of the proceeds of Defendants' fraudulent scheme would not have been collected.

7.    Through this Complaint, Plaintiffs seek rescission of their investments, restitution of their invested funds, compensatory damages, statutory penalties, treble damages, punitive damages, injunctive relief and attorneys' fees, holding each Defendant accountable for its role in this scheme.

**COMPLAINT**

# PARTIES

## *PLAINTIFFS*

### *"VWF Plaintiffs"*

8.     Plaintiffs are the following sixty-six (66) individuals who collectively invested more than $6.8 million in securities offered by the Defendants, namely: Marisol Aquino; Santa Fe Bernacer; Renita Castaneda; Renato Castaneda; Henadene Catolico; Michael Clark; Santito Cruz De Guzman; Rhodora Dela Cruz; Eleanor Deluna; Basilia Estimo; Elaine Everett; Michelle Fermin; Ricardo Floirendo; Alicia Fortaleza; Karen Franklin; Marimer Gebusion; Malu Gonzalo; Jose Gratais; Marissa Gutierrez; Donna Hansen; Milagros Josue; Lani Lagudas; Mary Jean Layugan; Evangeline Leyson; Susan Lim; Princesita Liwanag; Enrique Lopez; Romulo Magtoto; Bella Manansala; Esther Marania; Yvonne Martin; Veranette Mc Kenzie; Celedonia Mehr; Trinidad Ruth Mejia; Arthur Mendoza; Yonne Mijares; Poeu Nak; Demetria Ordanza; Violeta Paderna; Corazon Padilla; Michael Pare; Mildred Parcasio; Eneida Paredes; Juliet Pescozo; Jesserie Quitoriano; Maynard Raquinio; Julius Rayo; Florence Remulla; Florence Reyes; Jacqueline Rivera; Maria Rivera; Wilfredo Rivera; Robert Rogge; Aurelia Samson; Lagrimas Saulog; Arianne Silva; June Small-Rolston; Alma Soria; Carlito Soria; Loreta Tuason; Josephine Turk; Noel Ulep; Daisy-Ann Valdez; Paul Valdez; Chona Vallejo; Brian Vasallo (collectively, "VWF Plaintiffs" or "Plaintiffs").

### *"Strata Plaintiffs"*

9.     A large fraction of the Plaintiffs invested in VWF by redirecting their retirement savings through self-directed individual retirement accounts custodied by Strata Trust. Those Plaintiffs include the following: Santa Fe Bernacer; Renita Castaneda; Renato Castaneda; Henadene Catolico; Michael Clark; Rhodora Dela Cruz; Eleanor Deluna; Basilia Estimo; Michelle Fermin; Ricardo Floirendo; Karen Franklin; Marimer Gebusion; Malu Gonzalo; Jose Gratais; Marissa Gutierrez; Donna

Hansen; Milagros Josue; Evangeline Leyson; Susan Lim; Romulo Magtoto; Bella
Manansala; Yvonne Martin; Veranette Mc Kenzie; Trinidad Ruth Mejia; Demetria
Ordanza; Violeta Paderna; Mildred Parcasio; Eneida Paredes; Juliet Pescozo; Jesserie
Quitoriano; Maynard Raquinio; Florence Remulla; Maria Rivera; Aurelia Samson;
Carlito Soria; Josephine Turk; Daisy-Ann Valdez; Paul Valdez; Brian Vasallo
(collectively, the "Strata Plaintiffs").

10. The Plaintiffs are predominantly lower middle-class career health care
workers, many of whom are first- or second-generation immigrants and members of a
close-knit ethnic community, residing primarily in California and Nevada. These
Plaintiffs had limited investing experience and financial sophistication, rendering
them particularly vulnerable to Defendants' fraudulent scheme.

## ***DEFENDANTS***

### *"Vivakor Defendants"*

11. Defendant Vivakor is a corporation duly organized and existing under
the laws of Nevada. At all relevant times, Vivakor conducted business in California,
actively participating in the fraudulent offerings, directly soliciting investors,
receiving investment proceeds, and facilitating the improper use and diversion of
Plaintiffs' investment funds. Vivakor is a publicly traded company that, until
recently, was listed on the Nasdaq Capital Market under the ticker symbol "VIVK."
(See Vivakor Press Release, a true and correct copy attached hereto as Ex. Q.)
Vivakor used VWF as a captive financing vehicle to raise investor capital for the
financing of RPCs. As Vivakor's own SEC filings reflect, Vivakor designed and
organized VWF as a special-purpose entity to manufacture, lease, and sell equipment
solely to Vivakor; Vivakor consolidated VWF as a variable interest entity in its
audited financial statements during the relevant period and only later deconsolidated
it. (See pages from Vivakor SEC filings, true and correct copies attached hereto as
Exs. T and U.) These admissions demonstrate Vivakor's control over VWF and

corroborate Plaintiffs' alter ego theory. *See infra* ¶¶ 31-35. Vivakor shared office space with VWF at 2 Park Plaza, Suite 800, Irvine, California 92614, and its principal place of business is located at 5220 Spring Valley Road, Suite 500, Dallas, Texas 75254.

12.    Defendant Nicosia is an individual who, at all relevant times, resided and conducted substantial business activities within the State of California and Utah. Nicosia was the CEO and Chairman of the Board of Directors of Vivakor until his resignation in or around September 2022. Nicosia's departure coincided with the SEC's filing of a civil fraud complaint against him, *SEC v. Nicosia, et al*., No. 1:22-cv-05761 (E.D.N.Y. September 27, 2022), charging Nicosia with participating in a microcap fraud scheme in which he dumped insider-held shares during undisclosed promotional campaigns. On April 4, 2023, the court entered a final judgment permanently enjoining Nicosia from violating the antifraud and registration provisions of the federal securities laws, imposing five-year penny stock and officer-and-director bars, and ordering him to pay over $795,000 in disgorgement, interest, and penalties. (A true and correct copy of the SEC's Litigation Release regarding Nicosia is attached hereto as Ex. N.) Nicosia served simultaneously as a co-manager of VWF. Nicosia was central to orchestrating, soliciting, and promoting the fraudulent securities offerings at issue in this action. Nicosia personally signed many of the Subscription Agreements between Plaintiffs and VWF. Beginning in November 2020, Nicosia made weekly in-person presentations at VWF's Irvine, California offices and via Zoom video conferences, using a PowerPoint presentation titled "Viva Wealth Fund 07.01.2021"—the Vivakor RPC Pitch—to solicit investments. (See Exs. A–J.) These presentations made numerous false representations about the economics of the RPC business opportunity, including fabricated "Kuwait Economics" and "Utah Economics" that purported to show substantial revenues from RPC operations in Kuwait and Utah, respectively, when, in

1  truth, Vivakor received little to no revenue from any RPC operations, anywhere.

2  (Vivakor and Nicosia are referred to collectively herein as the "Vivakor

3  Defendants.")

4                              ***"VWF Defendants"***

5       13.    Defendant VWF is a Nevada limited liability company created and

6  operated by Lee and Wealth Space involved specifically in the offering and sale of

7  securities to Plaintiffs. VWF conducted substantial operations within California,

8  received investment funds directly from Plaintiffs, and materially contributed to the

9  violations alleged herein. VWF's principal place of business was located at 1 Park

10  Plaza, Suite 600, Irvine, California 92614, and formerly at 2 Park Plaza, Suite 800,

11  Irvine, California 92614.

12       14.    Defendant Wealth Space is a California limited liability company

13  formed and incorporated in 2018 by Lee and Tran, a close associate of Lee. Wealth

14  Space functioned as the operational arm of the solicitation effort—organizing

15  investor meetings, distributing promotional materials, and drafting Subscription

16  Agreements. In a sworn declaration, Lee admitted that "Cindy Tran and myself,

17  formed and incorporated Wealth Space, LLC and Wealth Space Insurance Agency,

18  Inc." (Decl. of Lee in Support of Opp'n to Prelim. Inj., *Johnson v. Lee*, Orange Cty.

19  Super. Ct., Case No. 30-2021-01234127-CU-EN-CJC, filed January 18, 2022, ¶3,

20  ROA No. 79). VWF's Limited Liability Company Agreement designates Wealth

21  Space—controlled by Lee and Tran—as VWF's "Manager." (See VWF's Limited

22  Liability Agreement, a true and correct copy attached hereto as Ex. V.) At all relevant

23  times, Wealth Space conducted substantial business activities within the State of

24  California and materially participated in the fraudulent securities offerings alleged

25  herein.

26       15.    Defendant Lee is an individual who, at all relevant times, resided and

27  conducted substantial business activities within the State of California. Lee was

28

1 central to orchestrating, soliciting, and promoting the fraudulent securities offerings

2 at issue in this action. Lee served as a manager of VWF and a former director of

3 Vivakor (a true and correct copy of the September 5, 2012 announcement of Lee's

4 appointment to Vivakor's Board of Directors is attached hereto as Ex. Q), as well as

5 CEO of Wealth Space. As described more fully below, Lee engaged in unregistered

6 broker-dealer activities in connection with the fraudulent offerings. Lee shared office

7 space with VWF at 2 Park Plaza, Suite 800, Irvine, California 92614.

8        16.     Defendant Tran is an individual who, at all relevant times, resided and

9 conducted substantial business activities within the State of California. Tran co-

10 founded Wealth Space with Lee in 2018 and served as a manager, executive vice

11 president and controlling person of Wealth Space throughout the relevant period.

12 Tran was instrumental in organizing and directing the solicitation of investors,

13 overseeing the preparation of Subscription Agreements and account-opening

14 paperwork, and managing the day-to-day operations of VWF's investor outreach.

15 Tran personally participated in the fraudulent securities offerings alleged herein and

16 materially contributed to the violations of federal and state securities laws described

17 in this Complaint. (VWF, Wealth Space, Lee, and Tran are referred to collectively

18 herein as the "VWF Defendants.")

19                          ***Strata Trust***

20        17.     Defendant Strata Trust is a trust company organized and existing under

21 the laws of the State of Texas, with its principal place of business in Waco, Texas

22 (see Ex. S). Strata Trust served as custodian for self-directed individual retirement

23 accounts ("SDIRAs") through which certain Plaintiffs invested in VWF securities.

24 Strata Trust was the indispensable gateway through which Plaintiffs' retirement

25 savings were channeled into VWF—the majority of the investments could not have

26 occurred without Strata Trust's approval, account creation, and wire transfer

27 execution. Far from acting as a neutral custodian, Strata Trust embedded its Regional

28

**COMPLAINT**

Director of Business Development, Defendant D. Rupper, inside Wealth Space to train promoters and expedite retirement fund transfers; accepted account applications pre-filled by Wealth Space personnel rather than by investors; and offered financial incentives to drive transaction volume. Defendant L. Rupper, D. Rupper's spouse, became an employee of Wealth Space. (Strata Trust's specific acts of facilitation are described more fully in paragraphs 61 through 66, infra.)

18.    Defendant D. Rupper is an individual who, at all relevant times, was employed by Strata Trust as its Regional Director of Business Development (see Ex. R). D. Rupper was embedded inside Wealth Space, where he trained promoters on how to solicit investors and expedite the transfer of retirement funds into VWF through Strata Trust's custodial platform. D. Rupper attended Wealth Space conventions and promotional events at which California investors were solicited (see Ex. K), and he served as the primary liaison between Strata Trust and the VWF promoter network. D. Rupper's integration into Wealth Space went far beyond any legitimate custodial function and was integral to the scheme's success. As described more fully below, D. Rupper was the subject of FINRA Disciplinary Proceeding No. 2014040501801, in which the Extended Hearing Panel found that he had knowingly produced an altered document to a regulator in connection with a securities investigation.

19.    Defendant L. Rupper is an individual who, at relevant times to the claims alleged herein, was employed by Wealth Space. (See Exs. L, M.) L. Rupper is the spouse of D. Rupper. L. Rupper's employment at Wealth Space further cemented the integration between Strata Trust and the VWF promoter network, creating an additional channel through which Strata Trust's interests were advanced within Wealth Space's operations. L. Rupper participated in the training of agents, the solicitation and processing of investor accounts and materially contributed to the fraudulent scheme alleged herein.

**COMPLAINT**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

***Alter Egos***

20.     At all relevant times, each Defendant acted as an agent, servant, employee, co-conspirator, alter ego and/or joint venturer of the other Defendants, and in doing the things alleged herein acted within the course and scope of such agency, employment, alter ego and/or in furtherance of the joint venture. Each of the Defendant's acts alleged herein was done with the permission and consent of each of the other Defendants.

***Doe Defendants***

21.     Defendants Does 1 through 50, inclusive, are individuals or entities whose identities and roles in the fraudulent scheme remain currently unknown to Plaintiffs. Upon discovery of their true identities and roles, Plaintiffs will amend this Complaint accordingly. Each Doe Defendant participated in, facilitated, assisted, conspired with, or materially aided the named Defendants in committing the unlawful acts alleged herein.

**JURISDICTION AND VENUE**

22.     This Court has subject matter jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. § 1331 (federal question) and 15 U.S.C. § 78aa (Exchange Act). The VWF membership interests are "securities" within the meaning of Section 3(a)(10) of the Securities Exchange Act of 1934, 15 U.S.C. § 78c(a)(10), because they constitute "investment contracts." Plaintiffs invested money in a common enterprise—VWF—with the expectation of profits derived solely from the managerial and entrepreneurial efforts of others, namely the Vivakor Defendants and VWF Defendants, who were to construct, operate, and derive revenue from the RPCs. Plaintiffs had no role in the management or operation of VWF or the RPCs. This Court has supplemental jurisdiction over Plaintiffs' state-law claims pursuant to 28

**COMPLAINT**

U.S.C. § 1367(a) because those claims derive from a common nucleus of operative facts.

23. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) and (c)(2) because a substantial part of the events giving rise to the claims occurred here. Further, the principal places of business of the Vivakor Defendants and the VWF Defendants are here. Finally, the residences of Lee, Tran and Nicosia are here.

24. Strata Trust will undoubtedly attempt to argue that this action must be litigated in Texas based on a forum-selection clause buried in Section 17.5 of its custodial account agreement, which purports to require all disputes to be brought in Travis County, Texas. This argument must fail. The forum-selection clause is unenforceable against Strata Plaintiffs and provides no basis for dismissal or transfer of this action. The custodial agreement containing the forum-selection clause is an entirely separate document from the account application that Plaintiffs actually signed. Critically, Strata Plaintiffs were never provided with the custodial agreement at any point during the account-opening process—it was not included with, attached to, or hyperlinked in the application. This undisputed fact is confirmed by Strata Trust's own business records: the electronic envelopes for Strata Plaintiffs' applications reflect a total page count far too low to have included the separate custodial agreement, conclusively establishing that only the bare application itself was ever transmitted for signature. Making matters worse, Strata Plaintiffs' account-opening paperwork was filled out entirely by VWF and Wealth Space personnel, who directed Strata Plaintiffs to sign without ever mentioning, explaining, or even acknowledging the existence of the forum-selection clause. No representative of Strata Trust ever communicated with Strata Plaintiffs regarding the clause. California law is clear: an extrinsic document may be incorporated into a contract by reference only where the reference is clear and unequivocal, expressly called to the other party's attention, and the incorporated terms are actually known or readily available

13

to the contracting parties.[1] Strata Trust cannot satisfy any of these requirements. Because Strata Plaintiffs were never provided the custodial agreement—a fact incontrovertibly proven by Strata Trust's own electronic records—and never knowingly consented to the forum-selection clause, there was no meeting of the minds as to this material term. Defendant Strata Trust cannot now invoke a clause that was deliberately concealed from Strata Plaintiffs to deprive this Court of jurisdiction over claims arising from Strata Trust's own misconduct.

25.     This Court has personal jurisdiction over all Defendants. The Vivakor Defendants and VWF Defendants are subject to personal jurisdiction because they maintained their principal places of business in California, operated VWF from offices in Irvine, California, and directed the solicitation, sale, and administration of the VWF securities offerings to California residents from within this District. Strata Trust is subject to specific personal jurisdiction in California because it purposefully availed itself of the privilege of conducting business in this state. Strata Trust opened and maintained custodial accounts for dozens of California-resident Plaintiffs, processing their retirement account rollovers into the VWF offering through its custodial platform. Strata Trust received and processed account applications originating from California, approved the transfer of California residents' retirement funds into VWF, and executed wire transfers directing those funds to VWF—all with knowledge that the investors and the fund's operations were based in California. Strata Trust's executive, D. Rupper, attended Wealth Space conventions and promotional events at which California investors were solicited, and Strata Trust embedded D. Rupper within the Wealth Space promoter network that primarily

---

[1] *Short v. Equity Trust Co.*, 2025 U.S. Dist. LEXIS 264071 (C.D. Cal. Nov. 13, 2025).

**COMPLAINT**

targeted California's Filipino-American community. Strata Trust entered into a custodial services relationship with VWF, a fund headquartered in Irvine, California, and derived substantial revenue from the custodial fees generated by California investors' accounts. These contacts were not random, fortuitous, or attenuated; they reflect Strata Trust's deliberate decision to serve as the custodial backbone of a securities offering centered in California and targeting California residents. Plaintiffs' claims arise directly from these California-directed activities of all Defendants.

## INTRADISTRICT ASSIGNMENT

26.     Pursuant to Civil Local Rule 3-2, this action is properly assigned to the Southern Division of the Central District of California. A substantial part of the events giving rise to the claims occurred in Orange County, including the principal offices of the Vivakor Defendants and the VWF Defendants, and Defendants' actions relating to the solicitation and administration of Plaintiffs' investments.

## FACTUAL ALLEGATIONS

### *The Fraudulent Scheme*

27.     Beginning around late 2020 and continuing through 2023, Vivakor and VWF Defendants commenced offering investment securities to, among others, Plaintiffs. These securities offerings were predominantly marketed to Plaintiffs and similarly situated investors.

28.     Defendants Lee and Nicosia personally spearheaded and actively engaged in investor solicitation. Lee and Nicosia communicated directly with prospective investors through in-person meetings, phone calls, emails, community-based presentations, and promotional events. Lee and Nicosia consistently emphasized the safety, profitability, and purported regulatory compliance of the VWF investment, specifically promoting: (a) fixed annual returns of 12% to investors for up to five years; (b) distribution of 25% of fund profits annually to investors; (c) K-1 tax deductions of up to 80% of the investment amount within the first 24 months; (d)

that the investment was backed by tangible RPC equipment; and (e) that the investment was backed by Vivakor public stock. (See Ex. G.) These representations were material to Plaintiffs' investment decisions and were false or materially misleading when made.

29.    VWF and Vivakor Defendants mounted a coordinated solicitation effort targeting Plaintiffs and other investors. Weekly meetings were held in Irvine, California, supplemented by scripted Zoom presentations and site visits designed to project legitimacy and progress. In January 2021 and June 2021, Vivakor and VWF Defendants hosted investors at Vivakor's RPC operations in Utah to demonstrate the equipment and induce further investment. In January 2023 and June 2024, these Defendants hosted investors for "groundbreaking" ceremonies in Houston, Texas, to demonstrate progress on the RPC equipment. Offering materials presented at these sessions portrayed Vivakor and VWF as indistinguishable, reinforcing the false impression that investors were investing directly in Vivakor, a public company.

30.    VWF and Vivakor operated as alter egos. Vivakor never treated VWF as an independent issuer; instead, it used VWF as a captive financing vehicle. Vivakor directed investor capital, managed development and marketing of Vivakor's RPCs, and shared personnel and resources with VWF. In every material respect, VWF functioned as Vivakor's alter ego.

31.    Vivakor's own SEC filings state that it "assisted in designing and organizing" VWF "as a special purpose entity" to manufacture, lease, and sell custom equipment "solely to" Vivakor, and that Vivakor was retained to operate plant/manufacturing for VWF—an admission that VWF existed to finance and execute Vivakor projects and not as an arm's-length third party. (See Ex. T.)

32.    Vivakor consolidated VWF as a variable interest entity ("VIE") in its audited financial statements, reflecting that Vivakor had the power to direct VWF's most significant activities and the right to receive benefits or absorb losses. Under

Generally Accepted Accounting Principles ("GAAP"), consolidation of a purportedly separate fund is powerful, objective evidence of unity of interest and ownership.

33.    Vivakor later deconsolidated VWF effective October 1, 2023, recognizing a gain on deconsolidation and reporting that VWF "began its own business activities" thereafter. However, Plaintiffs were not even notified that this deconsolidation effectively extinguished their interest. The timing and content of this change further confirm that, during the offering period at issue, VWF was controlled and directed by Vivakor; only after the relationship came under pressure did Vivakor attempt to formalize separation.

34.    Vivakor's disclosures also describe VWF fundraising totals, intercompany payables/receivables, and related-party transactions (including payments to affiliated service providers), corroborating that VWF operated as a financing conduit integrated with Vivakor's operations.

35.    These admissions, taken together with the overlapping managers (Lee and Nicosia), shared marketing, and commingled functions, establish unity of interest and a resulting injustice if the corporate form is respected. They independently support alter ego liability between the Vivakor Defendants and VWF Defendants, and, at minimum, control-person liability under California Corporations Code § 25504 and Section 20(a) of the Exchange Act.

### *Misrepresentations Regarding Experience and Capability*

36.    Vivakor Defendants and VWF Defendants falsely represented that they had the experience and technical capability to build and operate RPC units capable of generating $20 million to $50 million in annual recurring revenue. (See Ex. H.) In support of these claims, Vivakor Defendants and VWF Defendants represented that Vivakor possessed "the only known system" capable of remediating soil contaminated with greater than 7% crude oil concentration. (See Ex. A.) Vivakor Defendants and VWF Defendants further touted a prominent advisory board to

project institutional credibility and induce Plaintiffs' trust. (See Ex. I.) These representations were material to Plaintiffs' investment decisions and were false when made. In truth, Vivakor Defendants and VWF Defendants lacked the technical expertise, operational infrastructure, and demonstrated track record necessary to deliver the promised performance, and no RPC unit built with Plaintiffs' capital ever generated any meaningful revenue.

### *Misrepresentations Regarding the RPC Equipment and Operations*

37.    Vivakor Defendants and VWF Defendants represented that they would operate the RPCs and pay Plaintiffs 25% of the resulting gross revenue derived therefrom. (See Ex. G.) This representation was materially misleading because Vivakor Defendants and VWF Defendants knew or should have known that the RPCs were not generating any revenue, and, in any event, that they could not do so without the addition of a "Wash Plant" (described in greater detail in paragraphs 50-51 below).

38.    Vivakor Defendants and VWF Defendants represented that each RPC paid for by Plaintiffs would be operational "in a few more months." These repeated timeline misrepresentations were designed to forestall investor inquiries and prevent Plaintiffs from discovering that the RPCs were not generating any revenue and that they could not do so without the addition of a Wash Plant.

39.    Vivakor and VWF Defendants reinforced these false timelines through a series of orchestrated investor events designed to create the appearance of progress. In January 2021 and June 2021, Vivakor and VWF Defendants transported Plaintiffs and other investors to Vivakor's operations in Utah to view RPC equipment, staging these visits to create the impression of an active, revenue-generating enterprise. In January 2023 and June 2024, these Defendants hosted investors at "groundbreaking" ceremonies in Houston, Texas, designed to project tangible progress on the construction of RPCs financed with Plaintiffs' capital. These events were calculated

**COMPLAINT**

1  to sustain investor confidence, forestall withdrawal requests, and induce additional

2  investment. In truth, no RPC financed by Plaintiffs' capital was operational at the

3  time of any such event, and Vivakor and VWF Defendants knew that no RPC would

4  become operational or generate the represented returns without the addition of a

5  Wash Plant—a fact they concealed from Plaintiffs at every such event. The effect of

6  these staged events was to perpetuate the fraud by replacing the transparency

7  investors demanded with theater designed to simulate progress.

8  ***Misrepresentations Regarding Kuwait Operations ("Kuwait Economics")***

9      40.    As part of the "Kuwait Economics" presented in the Vivakor RPC Pitch

10  (see Exs. A–D), Vivakor Defendants and VWF Defendants made the following false

11  representations to Plaintiffs regarding Vivakor's Kuwait operations:

12          (a)    That a RPC was "currently operational" in Kuwait and had

13          received $72 per cubic meter (or $55 per ton) of soil processed and

14          cleaned (see Ex. D), when in truth Vivakor received little to no revenue

15          or income from the operation of any RPC in Kuwait at any time, and no

16          RPC was or had been operational in Kuwait as represented;

17          (b)    That Kuwait operations had been "paused due to Covid-19" and

18          would resume, when in truth there were no commercially productive

19          Kuwait operations to pause or resume, and the purported COVID-19

20          disruption was invoked to provide a facially plausible explanation for the

21          absence of current revenue and to forestall investor inquiry into the

22          actual status of Vivakor's Kuwait operations;

23          (c)    That each RPC had the capacity to clean approximately 480 tons

24          of contaminated soil per day and recover up to 250 barrels of heavy

25          crude or bitumen per day and the amount of material to be cleaned in the

26          Kuwait project was approximately 27 million cubic meters, with at least

27

28

**COMPLAINT**

10 million cubic meters containing in excess of 7% hydrocarbons (see Exs. A, D);

(d)     That the United Nations had allocated $20 billion to clean up contaminated soil in the Kuwaiti desert created by the Gulf Wars and the total Kuwait project was valued at $3.1 billion. (See Exs. A, B.)

41.     These "Kuwait Economics" were fabricated and designed to create the false impression that Vivakor's RPC technology was commercially proven and generating substantial revenue from foreign operations, thereby inducing Plaintiffs to invest. The Kuwait Economics were central to the Vivakor RPC Pitch because they purported to demonstrate, with specific dollar figures and operational metrics, that Vivakor had already proven the commercial viability of its RPC technology at scale in a real-world deployment. By representing that an RPC was "currently operational" in Kuwait and processing soil at $72 per cubic meter, Defendants manufactured a track record of demonstrated performance that did not exist. Defendants further insulated these fabrications from investor scrutiny by attributing the absence of current revenue to a purported COVID-19 "pause" in Kuwait operations—an explanation calculated to provide a facially plausible reason for the lack of verifiable income while preserving the fiction that the underlying technology had been proven. In reality, Vivakor's Kuwait operations never achieved the commercial results represented, and the "Kuwait Economics" were a fabrication designed to make Plaintiffs believe they were investing in proven, revenue-generating technology rather than unproven equipment that could not function as described.

### *Misrepresentations Regarding Utah Operations ("Utah Economics")*

42.     As part of the "Utah Economics" presented in the Vivakor RPC Pitch (see Exs. E–F), Defendants made the following false representations to Plaintiffs regarding Vivakor's Utah operations:

(a)    That the Vivakor RPC in Utah created for sale one ton of asphaltic cement at $67 to $125 per barrel from approximately ten tons of cleaned soil (see Ex. F), when in truth Vivakor received little to no revenue or income from the operation of any RPC in Utah;

(b)    That each RPC was capable of processing 360 tons of soil per day (see Ex. F); and

(c)    That Vivakor controlled 760 acres of oil sands land in Utah with 44.7 million barrels of proven reserves. (See Ex. E.)

43.    These "Utah Economics" were fabricated and designed to create the false impression that Vivakor's RPC technology was commercially proven and generating substantial revenue from domestic operations, thereby inducing Plaintiffs to invest. The Utah Economics were presented alongside the Kuwait Economics to reinforce the narrative that Vivakor's RPC technology was generating revenue across multiple geographies and market conditions. The site visits that Defendants organized to Utah in January and June 2021 were specifically designed to corroborate these fabricated economics by showing investors physical RPC equipment in the field. By claiming that each RPC could process 360 tons of soil per day and that Vivakor controlled 760 acres of oil sands with 44.7 million barrels of proven reserves, Defendants created the false impression that the investment opportunity was supported by an enormous, quantifiable resource base and demonstrated processing capacity. In truth, Vivakor received little to no revenue from its Utah operations, and the RPC equipment Plaintiffs observed during site visits was not generating the commercial returns Defendants represented.

### False Representations Regarding Regulatory Compliance

44.    Defendants explicitly represented to investors, including Plaintiffs, that the securities offerings were exempt from registration requirements under Rule 506(b) of Regulation D. Defendants stated that they maintained rigorous compliance

with applicable state and federal securities laws, including strict verification that all participating investors were accredited investors, and promised prompt delivery of necessary audited financial statements and disclosures required for non-accredited participants. These representations were critical to Plaintiffs' investment decisions because the federal and state securities registration requirements that Defendants claimed to be exempt from exist to protect investors. Registration with the SEC requires an issuer to provide detailed financial disclosures, audited financial statements, and material risk factors so that investors can make informed decisions. When an issuer claims an exemption from registration under Rule 506(b), investors forgo these protections in exchange for the issuer's compliance with the conditions of the exemption—principally, that the offering is limited to accredited investors (or no more than thirty-five non-accredited investors who receive the disclosures mandated by Rule 502(b)), that no general solicitation is used, and that the issuer files a Form D notice with the SEC and applicable state regulators. Defendants' assurances that these conditions were being met were therefore not merely representations about regulatory compliance in the abstract; they were assurances that Plaintiffs' investments were being conducted within a legal framework designed to protect them from precisely the kind of fraud that Defendants were perpetrating.

45.    To induce investments, Defendants provided Plaintiffs Subscription Agreements and investor questionnaires purportedly designed to confirm their accredited status. Defendants specifically assured Plaintiffs that required audited financial disclosures mandated by Rule 502(b)(2)(i)(B) would be timely provided to investors "within 120 days."

46.    Contrary to these assurances, Defendants systematically failed to comply with essential federal and California state securities laws. Defendants knowingly permitted non-accredited investors to invest without conducting proper accreditation verification or providing the mandatory audited financial statements. Based on

information and belief, the total number of non-accredited investors permitted by Defendants to participate in these offerings is in the hundreds. Internal documentation clearly establishes that investors in VWF were demonstrably non-accredited, yet were permitted to participate without mandated disclosures. The consequences of Defendants' knowing admission of hundreds of non-accredited investors cannot be overstated. Under Rule 506(b), no more than thirty-five non-accredited investors may participate in the offering. By exceeding that threshold many times over, Defendants destroyed the only federal exemption from registration on which the legality of the offering depended. Once the exemption was lost, every sale of VWF securities— whether to accredited or non-accredited investors—constituted an unlawful offer and sale of unregistered securities in violation of Section 5 of the Securities Act of 1933. The loss of the exemption was not prospective; it retroactively rendered illegal every prior sale in the offering. And because Defendants simultaneously failed to provide the audited financial statements, risk disclosures, and other information mandated by Rule 502(b)(2) for non-accredited participants, Plaintiffs and other non-accredited investors were denied the very disclosures designed to enable them to evaluate the risks of the investment—risks that, as alleged herein, were extreme and deliberately concealed. Defendants' failure to comply with accreditation requirements also independently destroyed any exemption under California Corporations Code Section 25102(f), which similarly requires that offers and sales of securities be limited to "qualified purchasers" as defined under California law. Accordingly, the VWF securities were offered and sold without any valid exemption from registration under either federal or California law.

### False Form D Filings and Regulatory Deception

47.    The Vivakor Defendants failed to timely file required regulatory notices, including Form D filings with the SEC and mandatory notices with the DFPI. When the Vivakor Defendants eventually filed Form D notices with the SEC in early 2023,

**COMPLAINT**

these filings falsely claimed that all participating investors were accredited, intentionally concealing the involvement of significant numbers of non-accredited investors. These fraudulent filings were designed to create the false appearance of regulatory compliance. A Form D is the regulatory notice an issuer must file with the SEC when claiming an exemption from securities registration under Regulation D. Timely filing is a condition of the exemption itself, and the information disclosed in a Form D—including the number and type of investors and whether any are non-accredited—is relied upon by the SEC and state regulators to monitor whether the conditions of the exemption are being satisfied. By failing to file any Form D during the first two years of the offering (late 2020 through early 2023), Defendants evaded regulatory scrutiny entirely during the period in which the vast majority of Plaintiffs' investments were solicited and collected. When the Vivakor Defendants belatedly filed Form D notices in early 2023, they compounded this violation by affirmatively misrepresenting that all investors were accredited—a statement that Defendants knew to be false, given that their own internal records reflected hundreds of non-accredited participants. The false Form D filings were a deliberate act of regulatory deception designed to conceal from the SEC and state regulators the fact that the offering lacked any valid exemption from registration. Similarly, Defendants' failure to file required notices with the DFPI deprived California's securities regulator of any opportunity to investigate or halt the offering before Plaintiffs' capital was consumed. These failures were not ministerial oversights; they were calculated decisions to keep the offering invisible to the regulatory bodies whose mandate is to protect investors like Plaintiffs from precisely the kind of fraud alleged herein.

### *Commission-Based Recruitment and Unlicensed Broker-Dealer Activity*

48.    VWF Defendants' promotional presentations—some of which Strata Trust's executive D. Rupper attended—explicitly included commission-based incentives for investors to recruit friends, family members, and others into the

securities offerings. These commission-based recruitment incentives encouraged existing investors to solicit investments from their personal and community networks, thereby significantly expanding the pool of investors while violating securities law standards relating to general solicitation and accredited investor verification. Rule 506(b) prohibits general solicitation and general advertising in connection with exempt offerings. By paying transaction-based commissions to unlicensed individuals to recruit new investors from their personal and community networks, Defendants converted what purported to be a limited private placement into a broadly solicited public offering—precisely the kind of offering that the Securities Act of 1933 and California Corporations Code Section 25110 require to be registered. The commission-based recruitment structure independently destroyed the Rule 506(b) exemption, regardless of the number of non-accredited investors, because it constituted general solicitation as a matter of law. Moreover, the payment of transaction-based compensation to individuals who were not registered as broker-dealers violated Section 15(a)(1) of the Securities Exchange Act of 1934 and California Corporations Code Section 25210, exposing Plaintiffs to risks from solicitation by persons who lacked the training, licensing, and regulatory oversight that broker-dealer registration is designed to ensure.

49.    Lee, the co-managing member of VWF, former Vivakor director (see Ex. Q), and CEO of Wealth Space, engaged in unregistered broker-dealer activities. Lee solicited investors, prepared and distributed offering documents, and oversaw Subscription Agreements—all without the broker-dealer registration mandated by Section 15(a)(1) of the Securities Exchange Act of 1934 and California Corporations Code Section 25210.

### Concealment of the Wash Plant Requirement

50.    Vivakor Defendants intentionally concealed from Plaintiffs that the RPC in which they were investing could not operate or generate revenue without

1  concurrently utilizing a Wash Plant costing an additional $3 million. The Vivakor

2  RPC Pitch presentations made over an almost two-year period (see Exs. A–J), the

3  RPC Lease Agreements, and all communications with investors contained no mention

4  or reference to a Wash Plant or that such equipment was necessary to operate any

5  RPC.

6       51.     A Wash Plant is a large-scale industrial processing facility designed to

7  separate soil, aggregate, and hydrocarbon material after initial thermal processing by

8  the RPC. Without a Wash Plant, the output of the RPC—a mixture of partially

9  processed soil and hydrocarbon residue—cannot be refined into commercially salable

10 products such as asphaltic cement or recovered crude oil, which were the very

11 products Vivakor and VWF Defendants represented would generate revenue for

12 investors. Vivakor's own internal documents and subsequent representations confirm

13 that Vivakor knew from the inception of the VWF offering that the RPC could not

14 generate the revenue represented to Plaintiffs without a complementary Wash Plant.

15 Despite this knowledge, Vivakor Defendants priced the investment to Plaintiffs at

16 $4.875 million per RPC unit—a figure that did not include the approximately $3

17 million cost of the Wash Plant—and led Plaintiffs to believe that each RPC was a

18 complete, self-sufficient system capable of generating revenue immediately upon

19 deployment. By concealing the Wash Plant requirement, Defendants ensured that the

20 revenue-sharing arrangement promised to investors was illusory from the outset:

21 Plaintiffs paid for equipment that was, by design, incapable of generating any revenue

22 on its own. The concealment of the Wash Plant was not merely an omission; it

23 rendered the entire investment premise presented to Plaintiffs—that their capital

24 would finance a turnkey, revenue-generating asset—fundamentally and deliberately

25 false.

26

27

28

**COMPLAINT**

*Misappropriation of Investor Funds*

52.    The Vivakor Defendants and the VWF Defendants represented that total commissions or sales loads would not exceed 2% of invested capital, whereas Plaintiffs were secretly charged commissions and fees of 7% to 10% of invested amounts. The Vivakor Defendants and the VWF Defendants further represented that the cost to build each RPC was $4.875 million, which included a $1 million intellectual property "licensing fee" payable to Vivakor, but later increased the cost to over $6 million per unit.

53.    Defendants improperly diverted substantial portions of the Plaintiffs' invested capital toward undisclosed fees, marketing expenses, and personal enrichment of Defendants Lee and Nicosia and affiliated insiders. Behind the scenes, Vivakor's officers and directors diverted investor funds to cover the company's growing financial shortfalls—including operating losses, liabilities, and executive compensation.

54.    In truth, the purported revenue figures presented to investors (see Exs. D, F, H) had no basis in fact, Vivakor's RPC technology never generated the commercial results that Vivakor and VWF Defendants represented, and Plaintiffs' invested capital was diverted to subsidize Vivakor's operating shortfalls and to enrich insiders. Despite collecting approximately $6.8 million from Plaintiffs for the construction and operation of RPCs, Vivakor Defendants never delivered a single operational, revenue-generating RPC unit to Plaintiffs. The escalating per-unit cost—from the original $4.875 million represented in the Vivakor RPC Pitch to over $6 million—reflected not legitimate construction expenses but the siphoning of investor capital to cover undisclosed commissions, marketing costs, Vivakor's operating losses, and insider enrichment. Plaintiffs' capital was consumed by Defendants' scheme before any RPC could become operational, and the concealed Wash Plant

**COMPLAINT**

1 requirement ensured that even a completed RPC could never have generated the

2 returns Vivakor and VWF Defendants promised.

3         ***Concealment and Failure to Provide Disclosures***

4     55.    In response to any requests for information by Plaintiffs, the Vivakor

5 Defendants and the VWF Defendants consistently delayed, avoided, provided

6 misleading responses, or entirely ignored investors' legitimate inquiries.

7     56.    Plaintiffs have not received the promised financial disclosures or

8 detailed accounting from the Vivakor Defendants or the VWF Defendants. Their

9 invested funds remain inaccessible, illiquid, and at risk due to the ongoing failure to

10 provide reliable or audited financial disclosures or transparent reporting.

11     57.    The concerted actions of the Vivakor Defendants and the VWF

12 Defendants were undertaken with the specific intent to: (a) mislead investors into

13 believing that the offerings were legally exempt from registration; (b) misappropriate

14 a portion of investors' contributions as undisclosed fees; (c) avoid scrutiny from

15 regulators by back-dating Form D filings after the fact; and (d) conceal the need for a

16 $3 million Wash Plant in order to retain control over the RPC operations and hoard

17 any profits therefrom.

18     ***Strata Trust Knew That It Was Being Used as a Means to Induce***

19     ***Unaccredited Investors to Invest in a Dubious, if Not Outright***

20     ***Fraudulent, Enterprise.***

21     58.    Strata Trust was aware—or, at minimum, recklessly disregarded—that

22 the VWF offering was being marketed to and accepted investments from non-

23 accredited investors, including elderly retirees with limited investment sophistication

24 who depended on fixed incomes and had no experience evaluating complex private

25 placements. Strata Trust processed *hundreds* of retirement account rollovers into the

26 same unregistered offering as part of a sustained, coordinated campaign—a pattern so

27 extraordinary in volume and uniformity that it should have triggered heightened

28

scrutiny—yet Strata Trust never verified accredited investor status, demanded audited
financial statements from the issuer, or performed any independent due diligence.
Strata Trust's failure to verify accredited investor status was particularly egregious
because the very nature of the accounts it was processing—retirement account
rollovers from elderly, fixed-income retirees—should have made clear that these
investors were overwhelmingly unlikely to meet the accreditation thresholds under
Regulation D, which require either annual income exceeding $200,000 (or $300,000
jointly) or a net worth exceeding $1 million exclusive of a primary residence. Strata
Trust knew, from its own account-opening records, the ages, income levels, and net
worth of the investors whose accounts it was processing—information that would
have revealed that many, if not most, of these investors did not meet the accreditation
standards that the VWF offering required. Strata Trust's decision to process these
transactions without any accreditation verification enabled the Vivakor Defendants
and VWF Defendants to admit non-accredited investors at a scale that destroyed the
Rule 506(b) exemption, thereby rendering the entire offering unlawful—a result that
Strata Trust's own minimal diligence could have prevented.

59.     Strata Trust's awareness of its role in the scheme is established by its
deep integration with the promoter network through the relationship between D.
Rupper and Wealth Space, as described in paragraphs 61 through 65, *infra*.

60.     D. Rupper attended Wealth Space conventions and retreats (see Ex. K),
the primary purpose of which was to raise additional funds for VWF and other
investment vehicles promoted by Lee and Tran.

61.     D. Rupper's own disciplinary history further demonstrates Strata Trust's
willful blindness. Before Strata hired him in approximately 2020, D. Rupper had been
the subject of FINRA Disciplinary Proceeding No. 2014040501801, in which the
Extended Hearing Panel found that D. Rupper had knowingly produced an altered
document to a regulator in connection with a securities investigation. (See Ex. P.) As

**COMPLAINT**

described more fully in paragraph 128, infra, D. Rupper's disciplinary history was publicly available and readily discoverable at the time Strata Trust hired him. Strata Trust's decision to hire and retain D. Rupper in a business development role—and then embed him inside Wealth Space—reflects, at minimum, a conscious disregard for the foreseeable consequences of his conduct.

62.     Strata Trust's integration with the promoter network extended further still. L. Rupper became a Wealth Space employee (see Exs. L, M) and played a direct role in driving the fraudulent scheme. L. Rupper trained agents on the full solicitation process: identifying elderly prospects, delivering the sales script, manufacturing urgency around transferring retirement funds, and securing signatures on documents the retirees had neither completed nor reviewed. Her role went well beyond walking clients through paperwork—she taught agents how to recruit new victims and route their savings through Strata Trust without any client involvement.

### *Strata Trust Rendered Substantial Assistance in the Primary Violations*

63.     Strata Trust rendered substantial assistance to the Vivakor Defendants and VWF Defendants in connection with their sale of unregistered and fraudulently marketed securities in violation of the California Corporate Securities Law of 1968. Strata Trust was the indispensable gateway through which Strata Plaintiffs' life savings were channeled into VWF—the majority of Plaintiffs' investment in VWF would not have occurred without Strata Trust's account creation, approval, and wire transfer execution. Strata Trust's substantial assistance included, but was not limited to, the following acts:

a. Embedding D. Rupper, its Regional Director of Business Development, inside Wealth Space to train promoters on soliciting investors, pitching the VWF program, targeting elderly retirees, and routing retirement fund transfers through Strata's custodial platform without client involvement;

b. Accepting account-opening forms and custodial applications that were pre-filled and submitted by Tran and other Wealth Space personnel—rather than by the investors themselves—without making any effort to verify that the retirees had ever seen, reviewed, or signed the documents submitted in their names;

c. Accepting custodial applications in which Wealth Space was designated as both "Representative" and "Interested Party" in Sections 7 and 8 of Strata's own Custodial Application (see Ex. O)—positions no legitimate custodian would assign to an investment fund promoter—in violation of Strata's own policies and Section 4975 of the Internal Revenue Code, thereby ceding control of Plaintiffs' SDIRAs to the very entities that were, in cahoots with Strata Trust, selling the securities;

d. Processing custodial agreements bearing electronic signatures affixed not by the investors themselves, but by Wealth Space personnel;

e. Executing wire transfers of investor funds to VWF without verifying accredited investor status, disclosing material risks, or performing any independent due diligence;

f. Financially incentivizing new VWF investors by offering discounted custodial fees, waiving wire fees, and granting account rebates—thereby actively encouraging participation in the fraudulent offering;

g. Processing over one hundred retirement account rollovers into a single unregistered offering as part of a sustained, coordinated campaign, without asking a single question about investor accreditation, issuer solvency, or use of proceeds.

64.     Without Strata Trust's custodial infrastructure, the fraudulent scheme could not have succeeded. Strata Trust provided the legitimacy, infrastructure, and liquidity that VWF and its promoters needed to exploit the Strata Plaintiffs—

31

**COMPLAINT**

1  transforming its custodial platform into a conduit for the systematic liquidation of

2  protected retirement accounts into a fraudulent, unregistered offering.

3  *Strata Trust Acted with Intent to Deceive or Defraud.*

4  65.Strata Trust acted with the requisite intent to deceive or defraud

5  Plaintiffs. Strata Trust knew that VWF and Wealth Space were effectively one and

6  the same enterprise, yet embraced the arrangement and converted its custodial role

7  into an engine of fraud from which it profited. The following facts, among others,

8  establish Strata Trust's intent:

9  a.Strata Trust knowingly enabled Wealth Space—an entity fronted by a

10  Strata Trust executive's spouse—to complete account-opening

11  applications for dozens of retirees solicited to invest in the same

12  investment vehicle, without any independent verification that the

13  investors had authorized or even seen the applications;

14  b.Strata Trust knowingly performed the acts described in paragraph 63(d),

15  processing custodial agreements bearing electronic signatures that it

16  knew were affixed by Wealth Space personnel rather than the investors

17  themselves;

18  c.Strata Trust hired and retained D. Rupper with knowledge of his FINRA

19  disciplinary history, which included findings of document falsification

20  and obstruction—demonstrating willful blindness to the obvious risks

21  posed by his conduct in a business development role;

22  d.Strata Trust monetized a regulatory blind spot—offering liquidity, speed,

23  and custodial infrastructure for transactions that no licensed broker-

24  dealer, bound by even minimal suitability standards, would have

25  processed; and

26

27

28

**COMPLAINT**

e.     The sheer volume and uniformity of the transactions—over one hundred rollovers of elderly retirees' entire retirement savings into a single thinly capitalized LLC with no operations, no regulatory filings, and no broker-dealer oversight—was so obviously suspicious that Strata Trust's failure to act constitutes, at minimum, willful blindness to the fraud it was facilitating.

## TIMELINESS OF CLAIMS

### *Exchange Act Claims*

66.     The claims asserted herein under Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder are timely under both the discovery-based limitations period and the statute of repose. Pursuant to 28 U.S.C. § 1658(b), a private right of action under Section 10(b) must be brought not later than the earlier of (1) two years after the discovery of the facts constituting the violation, or (2) five years after such violation.

67.     Plaintiffs did not discover, and could not have discovered through the exercise of reasonable diligence, the facts constituting Defendants' violations of Section 10(b) and Rule 10b-5 until, at the earliest, April 2, 2025, when Plaintiffs received a letter from Lee that disclosed, for the first time, facts sufficient to reveal the existence and scope of Defendants' fraudulent scheme. This Complaint is filed within two years of that discovery and is therefore timely under 28 U.S.C. § 1658(b)(1).

68.     Defendants systematically responded to any of Plaintiffs' inquiries by actively concealing the true nature of their violations, and by delaying, providing misleading assurances, and refusing to produce requested documentation.

69.     This Complaint is also timely under the five-year statute of repose set forth in 28 U.S.C. § 1658(b)(2). Plaintiffs' investments occurred during the time

period between late 2020 and 2023, and the fraudulent concealment has been ongoing. This Complaint is filed within five years of those violations.

### *California Securities Law Claims*

70. The claims asserted herein under California Corporations Code Sections 25110, 25401, 25500, and 25504 are independently timely under California law. Pursuant to California Corporations Code Section 25506(b), such claims must be brought within one year after the discovery of the facts constituting the violation, and in no event more than five years after such violation.

71. Plaintiffs' investments occurred during the time period between late 2020 and 2023, and the fraudulent concealment has been ongoing. This Complaint is filed within five years of those transactions and is therefore within the absolute five-year repose period of Section 25506(b).

72. Plaintiffs did not discover, and could not through the exercise of reasonable diligence have discovered, the facts constituting Defendants' violations of the California Corporate Securities Law until Lee's letter of April 2, 2025, at the earliest. This Complaint is filed within one year of that discovery date and is therefore timely under the one-year limitations period of Section 25506(b).

### *Common Law Fraud Claims*

73. Plaintiffs' common law fraud claims are timely under California's discovery rule. Plaintiffs did not discover the facts constituting Defendants' fraud until Lee's letter of April 2, 2025, at the earliest. This Complaint is filed well within three years of that date.

### *Unfair Competition Claims*

74. Plaintiffs' claims under California Business and Professions Code Section 17200 are timely under the four-year statute of limitations. Plaintiffs did not discover the facts underlying these claims until Lee's letter of April 2, 2025, at the earliest.

*Grand Theft Claims*

75.    Plaintiffs' civil claims arising from Defendants' grand theft are timely under the three-year limitations period. Plaintiffs did not discover the facts constituting Defendants' grand theft until Lee's letter of April 2, 2025, at the earliest.

***Defendants' Fraudulent Concealment Tolled All Limitations Periods***

76.    To the extent Defendants contend that any applicable statute of limitations bars any claim asserted herein, Defendants are equitably estopped from asserting such a defense by reason of their fraudulent concealment.

77.    Under both federal and California law, equitable tolling suspends the running of the limitations period where a defendant engages in affirmative acts of concealment.

78.    Defendants actively concealed their fraudulent conduct through multiple affirmative acts, including false representations of compliance and filing materially false Form D notices with the SEC.

79.    Defendants consistently failed to respond to, or responded misleadingly to, Plaintiffs' repeated requests for financial statements, regulatory filings, and accounting of investor funds.

80.    Plaintiffs satisfied their burden to exercise reasonable diligence, repeatedly requesting documentation beginning in early 2023.

81.    Despite their reasonable diligence, Plaintiffs were unable to discover the facts constituting Defendants' violations until Lee's letter of April 2, 2025, at the earliest.

82.    Accordingly, all applicable limitations periods were tolled by Defendants' fraudulent concealment and did not begin to run until April 2, 2025, at the earliest. This Complaint is timely as to all claims.

# RELATED LITIGATION

83.    VWF has filed a separate lawsuit in the Superior Court of California, County of Orange (Case No. 30-2025-01469418-CU-FR-WJC), against Vivakor, James Ballengee, Nicosia, Tyler Nelson, and VivaVentures Remediation Corp., alleging fraud, conversion, unfair competition, negligent misrepresentation, breach of contract, grand theft, and seeking declaratory relief. Plaintiffs herein—the same defrauded investors who, between 2020 and 2023, invested through VWF for the construction and operation of the RPCs conceived, promoted, and controlled by Vivakor—have moved to intervene in that action. The Orange County action is currently stayed pending a related case in Utah, *VivaVentures Remediation Corp. v. Viva Wealth Fund I LLC*, No. 250907053 (Utah 3d Jud. Dist. Ct., Salt Lake Cnty., filed Aug. 27, 2025). The allegations in that action, which arise from a lease agreement between VWF and Vivakor that was executed *after* the wrongful conduct alleged herein—though separate from Plaintiffs' allegations asserted herein— corroborate and support these claims, and demonstrate that Defendants' fraudulent scheme victimized the individual investors named herein in addition to any purported harm alleged by VWF itself.

84.    Although the Orange County Action stems from the same relationship between Vivakor and VWF that gives rise to Plaintiffs' claims herein, it cannot serve as the vehicle for Plaintiffs to allege their securities fraud and common law fraud claims against the Vivakor Defendants and VWF Defendants that they allege in this action.

85.    In response to a demand letter sent to Strata Trust on behalf of the Strata Plaintiffs, Strata Trust commenced a declaratory relief action in the District Court of Travis County, Texas, entitled *Strata Trust Company v. Marisol Aquino, et al.* (CAUSE NO. D-1-GN-25-007173) (the "Texas Action"). The Strata Plaintiffs have moved to dismiss the declaratory relief claim and have asserted counterclaims against

Strata Trust. For the reasons set forth in paragraph 25, *supra*, however, Strata Plaintiffs' claims against Strata Trust belong here.

**FIRST CLAIM FOR RELIEF**

***Scheme Liability Under Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c)***

*(Against the Vivakor Defendants and the VWF Defendants)*

86. Plaintiffs incorporate by reference paragraphs 1 through 85 of this Complaint as though fully set forth herein.

87. Rules 10b-5(a) and (c) make it unlawful, in connection with the purchase or sale of any security, to employ any device, scheme, or artifice to defraud or engage in any act, practice, or course of business which operates as a fraud or deceit.

88. The Vivakor Defendants and the VWF Defendants engaged in a coordinated fraudulent scheme including: (a) soliciting non-accredited investors under false pretenses; (b) distributing private placement memorandums ("PPMs") with materially false statements; (c) orchestrating back-dated Form D filings; (d) dividing investor proceeds through undisclosed fees exceeding 2%; (e) employing commission-based recruitment to expand the scheme; and (f) with respect to the Vivakor Defendants, at a minimum, concealing the $3 million Wash Plant requirement necessary to operate the RPC equipment.

89. Each of the Vivakor Defendants and the VWF Defendants acted with scienter. Plaintiffs were damaged as a direct and proximate result. Each of the Vivakor Defendants and the VWF Defendants is jointly and severally liable for compensatory damages, disgorgement, interest, and costs.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## SECOND CLAIM FOR RELIEF

### *Violation of Section 10(b) of the Exchange Act and Rule 10b-5(b)*

*(Against the Vivakor Defendants and the VWF Defendants)*

90.    Plaintiffs incorporate by reference paragraphs 1 through 89, to the extent applicable, of this Complaint as though fully set forth herein.

91.    The Vivakor Defendants and the VWF Defendants made material misrepresentations including: (a) all investors were accredited; (b) audited financials would be provided within 120 days; (c) investor principal had guaranteed downside protection, including that the investment was backed by tangible RPC equipment and by Vivakor public stock; (d) management was institutional-grade and supported by a prominent advisory board (see Ex. I); (e) commissions would not exceed 2%; (f) investors would receive 12% annual returns for up to five years, 25% of fund profits distributed annually, and K-1 tax deductions of up to 80% of the investment amount within the first 24 months (see Ex. G); (g) RPC equipment was operational and generating revenue in Utah and Kuwait (see Exs. D, F); (h) Vivakor possessed "the only known system" capable of remediating soil contaminated with greater than 7% crude oil concentration (see Ex. A); (i) the total Kuwait project was valued at $3.1 billion and Kuwait operations would begin in 2021 (see Exs. A, B); (j) Vivakor controlled 760 acres of oil sands land in Utah with 44.7 million barrels of proven reserves (see Ex. E); and (k) with respect to the Vivakor Defendants, at a minimum, that the RPC equipment could operate and generate revenue as represented without disclosing the $3 million Wash Plant requirement (see Exs. A–J).

92.    The Vivakor Defendants and the VWF Defendants omitted critical facts including: (a) more than thirty-five non-accredited investors invalidated the Rule 506(b) exemption; (b) funds were diverted to undisclosed commissions; (c) audited financials were never prepared; (d) Vivakor was financially unstable; (e) no valid registration exemption existed; (f) Vivakor received little to no revenue from its

purported RPC operations in Utah and Kuwait; and (g) with respect to the Vivakor Defendants, at a minimum, that each RPC could not operate without a $3 million Wash Plant. These omissions were material individually and devastating in combination. Omissions (a) and (e) meant that the VWF offering lacked any valid exemption from federal or state securities registration—a fact that, had it been disclosed, would have revealed to Plaintiffs that their investments were being conducted outside the legal framework that Defendants represented was protecting them. Omission (c) meant that Plaintiffs were denied the audited financial statements that would have revealed Vivakor's true financial condition and the absence of commercial revenue from RPC operations. Together, these omissions ensured that Plaintiffs could not discover—and were never given the tools to discover—that the offering was unlawful, that Defendants' revenue claims were fabricated, and that the investment premise was built on a foundation of concealment and deception.

93.     The Vivakor Defendants and the VWF Defendants acted with scienter. Plaintiffs reasonably relied on these misrepresentations. Each Defendant is jointly and severally liable for compensatory damages, pre- and post-judgment interest, and costs.

## THIRD CLAIM FOR RELIEF

### *Control Person Liability Under Section 20(a) of the Exchange Act*

*(Against Defendants Vivakor, Lee, Nicosia, and Tran)*

94.     Plaintiffs incorporate by reference paragraphs 1 through 93 of this Complaint, to the extent applicable, as though fully set forth herein.

95.     Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a), provides that every person who, directly or indirectly, controls any person liable under the Exchange Act shall be jointly and severally liable with and to the same extent as such controlled person, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation.

As alleged herein, VWF and Wealth Space committed primary violations of Section 10(b) and Rule 10b-5 through the scheme to defraud and material misrepresentations described in the First and Second Claims for Relief.

96.     Vivakor controlled VWF by designing and organizing it as a special-purpose entity, consolidating it as a variable interest entity, directing its most significant activities, and sharing overlapping management. Lee controlled VWF as its co-managing member and controlled Wealth Space as its CEO and co-founder. Nicosia controlled VWF and Wealth Space as their co-manager and controlled Vivakor as its CEO and Chairman of the Board of Directors during the relevant period. Tran controlled Wealth Space as its co-founder and co-manager. Each of these Defendants had the power to direct or cause the direction of the management and policies of the primary violators. None of these Defendants acted in good faith; to the contrary, each directly or indirectly induced the acts constituting the violations. Vivakor, Lee, Nicosia, and Tran are each jointly and severally liable as controlling persons under Section 20(a) for compensatory damages, pre- and post-judgment interest, and costs.

## FOURTH CLAIM FOR RELIEF

### *Violation of California Corporations Code Section 25110*

*(Against the Vivakor Defendants and the VWF Defendants)*

97.     Plaintiffs incorporate by reference paragraphs 1 through 96 of this Complaint, to the extent applicable, as though fully set forth herein.

98.     Section 25110 makes it unlawful to offer or sell a security in California unless qualified or exempt. Section 25503 provides liability for rescission or damages plus interest. California's securities registration requirement under Section 25110 is a strict liability provision: any offer or sale of a security in California that is not qualified by permit or covered by an exemption is unlawful, regardless of whether the issuer acted with fraudulent intent. The registration requirement exists to ensure that

1  California investors receive the material disclosures necessary to make informed

2  investment decisions before committing capital. The VWF membership interests are

3  "securities" within the meaning of California Corporations Code Section 25019 and

4  were never qualified by coordination, notification, or permit under Sections 25111

5  through 25113.

6      99.    The VWF membership interests were offered and sold without

7  qualification because: (a) Defendants failed to limit to qualified purchasers; (b) the

8  Vivakor Defendants and the VWF Defendants used general solicitation inconsistent

9  with exemptions; and (c) the Vivakor Defendants failed to file required notice with

10  the DFPI. The only exemption Defendants claimed was under California

11  Corporations Code Section 25102(f), which permits limited offerings to "qualified

12  purchasers" without qualification, provided that certain conditions are met—

13  including that the issuer file a notice with the DFPI and limit the offering to persons

14  who meet the statutory definition of "qualified purchaser." Defendants' wholesale

15  admission of hundreds of non-accredited, unqualified investors destroyed this

16  exemption. Further, Defendants' use of commission-based recruitment through

17  Wealth Space's agent network constituted general solicitation inconsistent with the

18  conditions of the exemption. And Defendants' failure to file the required notice with

19  the DFPI independently forfeited the exemption. Each of these violations standing

20  alone would have been sufficient to destroy the exemption; together, they

21  demonstrate that the Vivakor and VWF Defendants never had any legitimate basis for

22  claiming that the VWF offering was exempt from California's securities qualification

23  requirements. Because no exemption was available and no qualification was obtained,

24  every offer and sale of VWF membership interests in California violated Section

25  25110 as a matter of law.

26

27

28

**COMPLAINT**

100.   Each of the Vivakor Defendants and the VWF Defendants is jointly and severally liable for rescission or damages plus interest pursuant to Sections 25503 and 25504.

### FIFTH CLAIM FOR RELIEF

#### *Violation of California Corporations Code Section 25401*

*(Against the Vivakor Defendants and the VWF Defendants)*

101.   Plaintiffs incorporate by reference paragraphs 1 through 100 of this Complaint, to the extent applicable, as though fully set forth herein.

102.   Section 25401 makes it unlawful to make untrue statements of material fact or omissions in connection with offering securities. Section 25500 provides the civil remedy.

103.   The Vivakor Defendants and the VWF Defendants made the material misrepresentations and omissions described in paragraphs 36 through 57, *supra*, in violation of Section 25401. Plaintiffs reasonably relied on those statements and suffered damages.

104.   Each of the Vivakor Defendants and the VWF Defendants is jointly and severally liable under Sections 25401 and 25500 for compensatory damages, exemplary damages, interest, and attorneys' fees.

### SIXTH CLAIM FOR RELIEF

#### *Violation of California Corporations Code Section 25504*

*(Against Defendants Vivakor, Lee, Nicosia, and Tran)*

105.   Plaintiffs incorporate by reference paragraphs 1 through 104 of this Complaint, to the extent applicable, as though fully set forth herein.

106.   Section 25504 renders jointly and severally liable every person who directly or indirectly controls a person liable under Section 25501 or 25503, every principal executive officer or director of a corporation so liable, and every employee who materially aids in the act or transaction constituting the violation. Vivakor

controlled VWF's affairs and consolidated VWF as a VIE. Lee, as co-managing member of VWF, former Vivakor director, and CEO of Wealth Space, and Nicosia, as CEO and Chairman of the Board of Vivakor and co-manager of VWF and Wealth Space, each directly or indirectly controlled VWF and materially aided the fraudulent offerings. Tran, as co-founder and manager of Wealth Space, directly or indirectly controlled VWF through Wealth Space's role as VWF's designated Manager, and materially aided the fraudulent offerings by directing the solicitation, enrollment, and processing of investor accounts.

107.    Vivakor, Lee, Nicosia, and Tran are jointly and severally liable under Section 25504 for rescission, penalties, interest, and attorneys' fees.

## SEVENTH CLAIM FOR RELIEF

### *Common Law Fraud*

*(Against All Defendants)*

108.    Plaintiffs incorporate by reference paragraphs 1 through 107 of this Complaint, to the extent applicable, as though fully set forth herein.

109.    The elements of common law fraud are satisfied. As set forth in paragraphs 36-54, *supra*, the Vivakor Defendants and the VWF Defendants made material misrepresentations with knowledge of falsity and intent to induce reliance.

110.    In addition, Strata Trust made material misrepresentations with knowledge of their falsity when representing to the Strata Plaintiffs that it is a neutral custodian with no interest or ties to any particular investment, including, without limitation, VWF (see Ex. S). As set forth in paragraphs 58-62, *supra*, that was false.

111.    Plaintiffs reasonably relied on Defendants' representations and suffered injury.

112.    Defendants' conduct was intentional, malicious, and oppressive, entitling Plaintiffs to punitive damages.

## EIGHTH CLAIM FOR RELIEF

### *Negligent Misrepresentation*

*(Against All Defendants)*

113.   Plaintiffs incorporate by reference paragraphs 1 through 112 of this Complaint, to the extent applicable, as though fully set forth herein.

114.   As set forth in paragraphs 36-37, *supra*, the Vivakor Defendants and the VWF Defendants made representations without reasonable grounds for believing them to be true.

115.   In addition, Strata Trust made the representations described in paragraph 110, *supra*, without reasonable grounds for believing them to be true.

116.   Plaintiffs justifiably relied on Defendants' misrepresentations, and suffered substantial damages.

## NINTH CLAIM FOR RELIEF

### *Grand Theft Under Penal Code Section 496*

*(Against All Defendants)*

117.   Plaintiffs incorporate by reference paragraphs 1 through 116 of this Complaint as though fully set forth herein.

118.   Penal Code Section 496(a) makes it unlawful to receive property obtained by theft. Section 496(c) provides treble damages plus costs and attorneys' fees.

119.   Defendants unlawfully appropriated Plaintiffs' funds by false pretenses, including taking over $6.8 million to build RPC equipment while concealing that such equipment was worthless and inoperable without a $3 million Wash Plant. Plaintiffs are entitled to treble damages, costs, and attorneys' fees pursuant to Penal Code Section 496(c).

**COMPLAINT**

# TENTH CLAIM FOR RELIEF

## <u>*Aiding And Abetting Securities Fraud (Cal. Corp. Code § 25504.1)*</u>

### *(Against Strata Trust, D. Rupper, and L. Rupper)*

120.   Plaintiffs incorporate by reference paragraphs 1 through 119 of this Complaint, to the extent applicable, as though fully set forth herein.

121.   California Corporations Code Section 25504.1 provides that any person who materially assists in any violation of Section 25110, 25120, 25130, 25133, or 25401, with intent to deceive or defraud, is jointly and severally liable with any other person liable under Chapter 2 of Part 4 of Division 1 of the California Corporations Code for such violation.

122.   To establish liability under Section 25504.1, Strata Plaintiffs must show: (a) a primary violation of the California Corporate Securities Law of 1968; (b) that the defendant had general awareness of its role in the primary violation; (c) that the defendant rendered substantial assistance in the primary violation; and (d) that the defendant acted with intent to deceive or defraud. Strata Trust, D. Rupper, and L. Rupper each satisfy these elements.

123.   As shown in paragraphs 27-65, *supra*, (a) the Vivakor Defendants and the VWF Defendants committed a primary violation of the California Corporate Securities Law of 1968; (b) Strata Trust, D. Rupper, and L. Rupper each knew of, and intentionally enabled, the commission of the primary violation, given D. Rupper's embedding inside Wealth Space and L. Rupper's employment there; (c) Strata Trust rendered substantial assistance to the securities fraud by providing the custodial infrastructure, liquidity, and institutional legitimacy necessary to finance the scheme; D. Rupper rendered substantial assistance through his direct participation in the solicitation of investors, training of promoters, and serving as the liaison between Strata Trust and the VWF promoter network; and L. Rupper rendered substantial assistance by training agents on the solicitation process, recruiting new investors, and

**COMPLAINT**

facilitating the routing of retirement savings through Strata Trust's custodial platform; and (d) Strata Trust, D. Rupper, and L. Rupper each acted with intent to deceive and defraud Strata Plaintiffs by, among other things, knowingly opening SDIRAs that were packaged by Wealth Space, which they knew to be an affiliate of VWF—the investment fund—and which was also designated as the customers' "Interested Party" and "Representative Party."

124.    As a result of the violations of Cal. Corp. Code § 25504.1 by Strata Trust, D. Rupper, and L. Rupper, Strata Plaintiffs suffered substantial damages. Strata Trust, D. Rupper, and L. Rupper are jointly and severally liable for such damages.

## ELEVENTH CLAIM FOR RELIEF
### *Negligent Hiring and Retention*
(*Against Defendant Strata Trust*)

125.    Strata Plaintiffs incorporate by reference paragraphs 1 through 124 of this Complaint, to the extent applicable, as though fully set forth herein.

126.    Strata Trust, as a custodian of SDIRAs, owed a duty to the Strata Plaintiffs to hire and retain competent employees who would have access to investor accounts and the authority to direct business development activities.

127.    Strata Trust breached that duty by hiring and retaining D. Rupper as its Regional Director of Business Development. Before Strata Trust hired him, D. Rupper had been the subject of FINRA Disciplinary Proceeding No. 2014040501801, in which the Extended Hearing Panel issued a decision on December 13, 2016, finding that D. Rupper engaged in serious misconduct while serving as Chief Compliance Officer of Texas E&P Partners, formerly known as Chestnut Exploration Partners. D. Rupper's FINRA BrokerCheck report (a true and correct copy of which is attached hereto as Ex. P) reflects his registration with Texas E&P Partners, Inc.

(CRD# 127228) from March 2015 through July 2016, as well as his association with Chestnut Exploration Partners, Inc., where he served as a Registered Representative. D. Rupper held Series 22 (Direct Participation Programs Representative) and Series 63 (Uniform Securities Agent State Law) licenses, demonstrating his involvement in securities transactions and private placements. FINRA's investigation concerned a private placement in an oil and gas company. Central to this investigation was the Turnkey Acquisition and Drilling Contract, a critical agreement that D. Rupper, as Chief Compliance Officer, was responsible for producing pursuant to FINRA Rule 8210 requests. When FINRA requested the Turnkey Acquisition and Drilling Contract, D. Rupper repeatedly claimed that the agreement could not be located. Despite these representations, D. Rupper subsequently transmitted a freshly signed PDF of the agreement to FINRA on December 3, 2014. Critically, D. Rupper had personally witnessed the document being newly signed immediately before its transmission to the regulator. D. Rupper produced the document to FINRA without disclosing that it had just been executed, thereby concealing that it was not an original, contemporaneous agreement. The Extended Hearing Panel concluded that the firm's misconduct was committed "through its owner and its chief compliance officer." This finding establishes that D. Rupper was not merely a passive participant but rather an active instrument through which the firm carried out its violations. FINRA determined that D. Rupper knowingly produced an altered document to the regulator, conduct that strikes at the heart of regulatory integrity and demonstrates a willingness to deceive authorities, obstruct investigations, and produce misleading documents.

128.   D. Rupper's FINRA disciplinary history was publicly available and readily discoverable through standard background checks, including FINRA's BrokerCheck system, at the time Strata Trust hired D. Rupper in approximately 2020 (see Ex. R). Strata Trust thus knew or should have known D. Rupper was

**COMPLAINT**

incompetent or otherwise unfit to be hired as an employee of Strata Trust. In the alternative, Strata Trust was negligent in retaining D. Rupper after learning of such prior misconduct.

129.   Strata Trust's hiring and continued employment of D. Rupper created an unreasonable risk of harm to Strata Plaintiffs. The nature of D. Rupper's prior misconduct—deceiving regulators in connection with a securities investigation—was directly relevant to the position for which Strata Trust hired him: Regional Director of Business Development, a role involving investor relations, capital raising, and alternative investments.

130.   D. Rupper engaged in tortious conduct damaging to Strata Plaintiffs, as described herein, including aiding and abetting securities fraud, facilitating the sale of unregistered securities, and participating in the fraudulent scheme that caused Strata Plaintiffs' losses.

131.   The damage caused by D. Rupper was foreseeable by Strata Trust given his background and previous conduct known to Strata Trust when it hired D. Rupper and then continued his employment.

132.   As a direct and proximate result of Strata Trust's negligent hiring and retention of D. Rupper, Strata Plaintiffs sustained damages in an amount to be proven at trial.

## TWELFTH CLAIM FOR RELIEF

### _Financial Elder Abuse (Cal. Welf. & Inst. Code §§ 15600 et seq.)_

_(Against All Defendants)_

133.   Plaintiffs incorporate by reference paragraphs 1 through 132 of this Complaint as though fully set forth herein.

134.   California's Elder Abuse Act was enacted to protect elders from financial abuse and to provide enhanced civil remedies against those who perpetrate such abuse. Under Welfare and Institutions Code section 15610.27, an "elder" is any

person residing in California who is 65 years of age or older. More than half of Plaintiffs were 65 years of age or older at the time they became Strata Trust customers and thus qualify as "elders" within the meaning of the Elder Abuse Act.

135.   Welfare and Institutions Code section 15610.30 defines "financial abuse" of an elder as occurring when a person or entity: (1) takes, secretes, appropriates, obtains, or retains real or personal property of an elder for a wrongful use or with intent to defraud; or (2) assists in any of the foregoing acts. Conduct is deemed "for a wrongful use" where the person or entity "knew or should have known that this conduct is likely to be harmful to the elder." (Welf. & Inst. Code, § 15610.30, subd. (b).)

136.   Defendants, and each of them, committed financial abuse of Plaintiffs' elder members by taking, secreting, appropriating, obtaining, and retaining the elders' personal property—their retirement savings, IRAs, 401(k) accounts, and other personal funds—for a wrongful use and with the intent to defraud, and by assisting one another in doing so. As set forth in paragraphs 28 through 68, supra, Defendants operated a coordinated scheme in which each Defendant played an indispensable role: the Vivakor Defendants and VWF Defendants conceived and directed the fraudulent solicitations targeting elderly retirees; Lee, Tran, and Wealth Space orchestrated the conversion of elders' retirement accounts and prepared the paperwork; and Strata Trust provided the custodial gateway, embedded personnel, and financial incentives that enabled the scheme to function. Defendants knew or should have known that their conduct was likely to be harmful to these elders, who were among the most vulnerable individuals entrusted to Defendants' care.

137.   As a direct and proximate result of Defendants' financial abuse, Plaintiffs' elderly members have lost their retirement savings—in many cases the entirety of their life savings—in an aggregate amount to be proven at trial but believed to exceed several million dollars. Many of these elderly Plaintiffs are first-

generation Americans with limited financial sophistication who were dependent upon their retirement accounts for daily living expenses, medical care, and basic sustenance. The loss of these funds has caused them severe economic hardship, emotional distress, and a fundamental diminishment of their quality of life.

138.    Defendants' conduct was carried out with willful and conscious disregard of the rights and safety of Plaintiffs' elderly members, and constitutes recklessness, oppression, fraud, and malice within the meaning of Welfare and Institutions Code section 15657.5 and Civil Code section 3294.

139.    Pursuant to Welfare and Institutions Code section 15657.5, Plaintiffs' elderly members are entitled to: (a) reasonable attorney's fees and costs (*id.*, subd. (a)); and (b) because Defendants' conduct was committed with recklessness, oppression, fraud, or malice, damages for pain, suffering, and other noneconomic losses without the limitations of Civil Code section 3333.2 (*id.*, subd. (b)); and (c) punitive and exemplary damages pursuant to Civil Code section 3294. Each Defendant is jointly and severally liable for the financial abuse inflicted upon Plaintiffs' elder members.

### THIRTEENTH CLAIM FOR RELIEF

### *Unfair Business Practices (Cal. Bus. & Prof. Code § 17200)*

#### *(Against Defendant Strata Trust)*

140.    Strata Plaintiffs incorporate by reference paragraphs 1 through 139 of this Complaint, to the extent applicable, as though fully set forth herein.

141.    California Business and Professions Code Section 17200 prohibits any "unlawful, unfair, or fraudulent business act or practice." Strata Trust's conduct as alleged herein constitutes unlawful business practices because it violates California Penal Code Section 496 (grand theft), gives rise to common law fraud, and constitutes negligent hiring and retention as set forth in the Ninth, Seventh, and Eleventh Claims for Relief, respectively.

**COMPLAINT**

142.    Strata Trust's conduct independently constitutes unfair business practices. Strata Trust accepted account-opening forms, custodial applications, and custodial agreements that were pre-filled and submitted by Tran, as President of Wealth Space, rather than by the investors themselves. Strata Trust made no effort to ensure that the retirees ever saw, reviewed, understood, or signed these documents. Strata Trust accepted custodial applications in which Tran had designated Wealth Space as both the account's "Representative" (Section 7 of the Strata Trust custodial application) and "Interested Party" (Section 8 of the Strata Trust custodial application) (see Ex. O), in violation of Strata Trust's own agreements, as referenced on the custodial applications themselves, and Section 4975 of the Internal Revenue Code. By accepting these promoter designations, Strata Trust ceded control of investor SDIRAs to the very entities soliciting investments and selling the securities, giving promoters the ability to control account authority, direct transactions, access confidential information, and liquidate retirement funds. These practices were unfair because they offended established public policy protecting retirement savings, were immoral, unethical, and unscrupulous, and caused substantial injury to the Strata Plaintiffs that they could not reasonably have avoided and that was not outweighed by any countervailing benefit to consumers or competition.

143.    Strata Trust's conduct further constitutes fraudulent business practices because it was likely to deceive members of the public, and did in fact deceive the Strata Plaintiffs, into believing that Strata Trust was acting as a neutral, independent custodian (see Ex. S) when it was in fact operating as an integral component of the fraudulent scheme.

144.    As a direct and proximate result of Strata Trust's unfair, unlawful, and fraudulent business practices, the Strata Plaintiffs have suffered injury in fact and have lost money and property. Strata Plaintiffs are entitled to restitution and disgorgement of all monies wrongfully obtained by Strata Trust, and to injunctive

relief prohibiting Strata Trust from continuing the unlawful practices alleged herein, pursuant to Business and Professions Code Sections 17200 and 17203.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully pray for judgment against Defendants, jointly and severally, as follows:

(i)     Compensatory damages, disgorgement, pre- and post-judgment interest, and costs on the First, Second, and Third Claims for Relief;

(ii)    Rescission or damages plus interest and attorneys' fees on the Fourth Claim for Relief;

(iii)   Compensatory and exemplary damages, interest, and attorneys' fees on the Fifth Claim for Relief;

(iv)    Rescission or damages, plus interest, penalties, and attorneys' fees, jointly and severally, against Vivakor, Lee, Nicosia, and Tran on the Sixth Claim for Relief;

(v)     Compensatory and punitive damages on the Seventh Claim for Relief;

(vi)    Compensatory damages on the Eighth Claim for Relief;

(vii)   Treble damages, costs, and attorneys' fees on the Ninth Claim for Relief;

(viii)  Compensatory damages, disgorgement, pre- and post-judgment interest, and costs on the Tenth Claim for Relief;

(ix)    Compensatory damages on the Eleventh Claim for Relief;

(x)     Compensatory damages, enhanced noneconomic damages, punitive damages, and reasonable attorney's fees and costs on the Twelfth Claim for Relief;

(xi)    Restitution, disgorgement, and injunctive relief against Strata Trust on the Thirteenth Claim for Relief;

(xii)   Pre-judgment and post-judgment injunctive relief, including a freeze of assets;

**COMPLAINT**

1      (xiii)   Costs of suit including reasonable attorneys' fees;

2      (xiv)   Pre- and post-judgment interest; and

3      (xv)   Such other and further relief as the Court deems just and proper.

### DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b) and Civil Local Rule 9-4, Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: February 26, 2026

Respectfully submitted,

**GLENN AGRE BERGMAN & FUENTES LLP**

By: _____

DAVID R. CALLAWAY (SBN 121782)
BURKE E. STRUNSKY (SBN 203582)
580 California Street, Suite 1420
San Francisco, CA 94104
Telephone: (415) 599-0880

**NIESAR & VESTAL LLP**

By: _____

JESSICA TARAN (SBN 224025)
90 New Montgomery St., 9th Floor
San Francisco, CA 94105
Tel: (415) 882-5300 Ext. 248

*Attorneys for Plaintiffs*

**COMPLAINT**